263 So.2d 165

Bobby DUKE, alias

v.

STATE.

7 Div. 56.

Court of Criminal Appeals of Alabama.
May 4, 1971.

Rehearing Denied May 25, 1971.

On Special Remand Nov. 9, 1971.

Rehearing Denied Nov. 30, 1971.

For decision on certiorari after remand, see Ala., 263 So.2d 176.

For decision after second remand see post p. 752, 263 So.2d 177.

Gus W. Colvin, Jr., and James S. Hubbard, Anniston, for appellant.

MacDonald Gallion, Atty. Gen., and Joseph Victor Price, Jr., Asst. Atty. Gen., for the State.

CATES, Judge.

Second degree murder: thirty years.

## I

The instant indictment charged Duke with the murder of Lelus L. Harrison. On pleas of autrefois acquit and double jeopardy it was shown that Duke was acquitted of the murder of Harrison's son, Le Grande Harrison. Code 1940, T. 15, § 288.

Duke sought to bring himself under the single-bullet-two-bodies-equal-only-one-murder rule of Gunter v. State, 111 Ala. 23, 20 So. 632.

However, he elected not to testify. Accordingly, the defense was apparently put in the position of using the State's witness, Melanie Sue Harrison, the daughter of Le Grande Harrison.

Under her testimony Duke was an accomplice of two other men who each in separate rooms respectively shot the two male Harrisons. Hence, the single bullet theory collapsed and the trial judge correctly gave the State's written requested affirmative charge.

## II

About one year after the killing Melanie Sue picked Duke out of a seven man lineup at the Hamilton County Jail in Chattanooga.

Duke's wife had retained a Chattanooga lawyer to defend him on a charge against him by the State of Tennessee. When Melanie Sue and the Alabama officers came to ask to see Duke in a lineup, the cognizant deputy phoned this lawyer at Duke's request.

The lawyer's senior partner answered the phone. The other lawyer being necessarily absent, the senior partner went to the jail, consulted with Duke and was present at the lineup.

On this appeal some argument was made that Duke (1) was entitled to have the absent lawyer; (2) since he was to be accused of an Alabama murder, was entitled to an Alabama lawyer; (3) at all events a lawyer cognizant of the opinions of the Supreme Court of the United States on counsel at lineups.

Because Duke had the services of the senior partner we do not think that this is necessarily an instance of "substitute counsel" within the reference used in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149. This expression was applied in United States v. Kirby, 138 U.S. App.D.C. 340, 427 F.2d 610 to a staff member of the Legal Aid Agency present at Kirby's lineup. See discussion in United States v. Valez, 8 Cir., 431 F.2d 622.

We find nothing parochially cis-Tennessean which would have pertained only to Alabama in conduct of the lineup and thus have required the presence of an Alabama lawyer rather than one admitted to practice in Tennessee. We see no need to enlarge as to what might have arisen in a converse situation as to the prerogatives of the bar of one state so as to limit practice by attorneys from without.

The third point came in the motion for new trial. However, it was not supported by an affidavit of the senior partner to the effect that he had not kept abreast of recent United States Supreme Court decisions. In the absence of some direct proof *ignorantia legis* will not be presumed of lawyers.

Moreover, the purpose of United States v. Wade, supra, and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 is prophylactic primarily in the realm of psychologically reducing misleading suggestiveness in identification. A lawyer's usefulness is basically to "show the flag" of the Law so that witnesses are not led into picking the wrong man. We perceive no arcane mysteries as between members of the civil bar and criminal practitioners in this field.

We have considered the entire record as required by Code 1940, T. 15, § 389 and conclude that the judgment below is due to be

Affirmed.

## ON SPECIAL REMAND FROM THE SUPREME COURT OF ALABAMA

Appellant was indicted April 5, 1968. On December 4, 1969 he filed his first written plea of autrefois acquit to which he append-ed a written demand for a jury trial.

On December 8 he filed two more such pleas. In addition he filed a plea of res judicata, (R. 31–35).

The State by replication alleged in part:

" * * * That the offense presently charged is not the same in law and fact as the former one relied on in said plea. All of which the District Attorney is ready to verify, and he prays judgment that the defendant be convicted of the premises in said indictment alleged."

Appellant demurred and the Court overruled the demurrer Dec. 9, 1969. Trial of the issues on this preliminary matter was had December 8 and 9, 1969. The main trial ran from December 10 through 12. Motion for a new trial was aborted for failure to present same to the trial judge within the time prescribed by Code 1940, T. 13, § 119.

Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469, applying collateral es-toppel as a concomitant of double jeopardy, was handed down April 6, 1970, some four months after judgment against Duke in the circuit court.

We consider that Ashe v. Swenson, supra, is prospective, applying only to trials of pleas of autrefois acquit held after April 7, 1970.

Collateral estoppel differs from res judicata in that in the latter the cause of action in the first and second occasions must be identical. Perhaps the most often cited opinion on this distinction is found in C. I. R. v. Sunnen, 333 U.S. 591, where at pp. 597 and 598, 68 S.Ct. 715 at p. 719, 92 L.Ed. 898 we find:

"It is first necessary to understand something of the recognized meaning and scope of *res judicata,* a doctrine judicial in origin. The general rule of res judicata applies to repetitious suits involving the same cause of action. It rests upon considerations of economy of judicial time and public policy favoring the establishment of certainty in legal relations. The rule provides that when a court of competent jurisdiction has entered a final judgment on the merits of a cause of action, the parties to the suit and their privies are thereafter bound 'not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.' Cromwell v. County of Sac, 94 U.S. 351, 352, [24 L.Ed. 195.] The judgement puts an end to the cause of action, which cannot again be brought into litigation between the parties upon any ground whatever, absent fraud or some other factor invalidating the judgment. See Von Moschzisker, 'Res Judicata,' 38 Yale L.J. 299; Restatement of the Law of Judgments, §§ 47, 48.

"But where the second action between the same parties is upon a different cause or demand, the principle of *res judicata* is applied much more narrowly. In this

situation, the judgment in the prior action operates as an estoppel, not as to matters which might have been litigated and determined, but 'only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered.' Cromwell v. County of Sac, supra, 353, [24 L.Ed. 195.] And see Russell v. Place, 94 U.S. 606, [24 L.Ed. 214;] Southern Pacific R. Co. v. United States, 168 U.S. 1, 48, [18 S.Ct. 18, 42 L.Ed. 355;] Mercoid Corp. v. Mid-Continent Inv. Co., 320 U.S. 661, 671, [64 L.Ed. 268, 88 L.Ed. 376.] Since the cause of action involved in the second proceeding is not swallowed by the judgment in the prior suit, the parties are free to litigate points which were not at issue in the first proceeding, even though such points might have been tendered and decided at that time. But matters which were actually litigated and determined in the first proceeding cannot later be relitigated. Once a party has fought out a matter in litigation with the other party, he cannot later renew that duel. In this sense, res judicata is usually and more accurately referred to as estoppel by judgment, or collateral estoppel. See Restatement of the Law of Judgments, §§ 68, 69, 70; Scott, 'Collateral Estoppel by Judgment,' 56 Harv.L.Rev. 1."

"The very nub of collateral estoppel is to extend *res judicata* beyond those cases where the prior judgment is a complete bar." United States v. Kramer, 2 Cir., 289 F.2d 909.

As between civil and criminal cases the principal variance in criminal applications is that while acquittal estops the prosecution, conviction does not estop the defendant even as a matter of evidence for the jury to weigh. In civil causes the doctrine must be a two way street applying equally to plaintiff as to defendant. Another notable difference in many jurisdictions arises from the use of special verdicts in civil procedure.

First we point out that no Alabama case has been shown to us applying the doctrine of collateral estoppel in a criminal case. Mitchell v. State, 140 Ala. 118, 37 So. 76, stated, by way of advice for a trial de novo, that the defendant—when faced with admission of proof of another crime not of the res gestae—was then entitled to show an acquittal of the other charge. No plea of autrefois acquit was involved.

Jay v. State, 15 Ala.App. 255, 73 So. 137, contains a learned discussion, all of which, however, is consigned to the realm of obiter dicta by the concluding paragraphs. Obviously perjury to secure acquittal neither fits the same evidence or the same transaction tests as to the antecedent accusation.

Hence, we conclude that collateral estoppel has not been accepted in Alabama as a bar to an indictment tried after an acquittal for a crime distinguishable under the Blackstonian "same offense" criterion. In Wildman v. State, 42 Ala.App. 357, 165 So.2d 396, the Court of Appeals construed Code 1940, T. 15, § 287 which is aimed at subdividing a single crime. Crosswhite v. State, 31 Ala.App. 181, 13 So.2d 693.

Federal jurisprudence has recognized a form of collateral estoppel to bar second prosecution for over fifty years. United States v. Oppenheimer, 242 U.S. 85, 37 S.Ct. 68, 61 L.Ed. 161. Nowhere in the vast literature on *Ashe*, supra, have we found that collateral estoppel was theretofore expressly assimilated by the Supreme Court of the United States into the meaning of double jeopardy as used in the Fifth Amendment.

Thus in Recent Developments, Constitutional Law—Double Jeopardy, etc., 69 Mich.L.Rev. 762 at pp. 765–766 the author comments:

"But the fact that the federal courts have traditionally used the doctrine of collateral estoppel in a criminal context was not sufficient to make that doctrine a *constitutional requirement.* * * * It seems clear from a variety of indications

by the Justices that the Court was concerned that the purpose of the ‎double jeopardy guarantee was being eroded through judicial interpretation and that it realized that collateral estoppel would in many cases promote the purposes of the traditional double jeopardy rule. These factors were at the core of [Ashe v. Swenson]." (Italics added; footnotes omitted).

Since Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601, prognosis of an overruling decision's thrust aft is clouded. On April 5, 1971 three decisions cast some light on inductive principles as to retrospectivity: Williams v. United States, 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388; Hill v. California, 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484; and Mackey v. United States, 401 U.S. 667, 91 S.Ct. 1160, 28 L. Ed.2d 404. All three are interconnected in this aspect.

The plurality opinion of White, J., in *Williams*, supra, states in part:

"Where the major purpose of new constitutional doctrine is to overcome an aspect of the criminal trial which substantially impairs its truth-finding function and so raises serious questions about the accuracy of guilty verdicts in past trials, the new rule has been given complete retroactive effect. Neither good-faith reliance by state or federal authorities on prior constitutional law or accepted practice, nor severe impact on the administration of justice has sufficed to require prospective application in these circumstances.

"It is quite different where the purpose of the new constitutional standard proscribing the use of certain evidence or a particular mode of trial is not to minimize or avoid arbitrary or unreliable results but to serve other ends. In these situations the new doctrine raises no question about the guilt of defendants convicted in prior trials. Mapp v. Ohio [367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081] cast no doubt on the relevance or probity of illegally seized evidence but excluded it from criminal trials to deter official invasions of individual privacy protected by the Fourth Amendment. Katz v. United States, 389 U.S. 347, [88 S.Ct. 507, 19 L.Ed.2d 576] (1967), overruled Olmstead v. United States, 277 U.S. 438, [48 S.Ct. 564, 72 L.Ed. 944] (1928), and Goldman v. United States, 316 U.S. 129, [62 S.Ct. 993, 86 L.Ed. 1322] (1942), and gave expanded Fourth Amendment protection against nonconsensual eavesdropping. It followed that evidence obtained by nontrespassory electronic surveillance of a public telephone booth became subject to the exclusionary rule, which had been fashioned by the Court to exact compliance with the Amendment rather than to protect defendants from conviction on untrustworthy evidence. Thus the Court, when it came to consider the retroactivity of *Mapp* and *Katz*, was dealing with cases quite different from those situations where emerging constitutional doctrine casts such doubt upon the soundness of some aspect of prior trials that state and federal governments were disentitled from further pursuing the goals of their criminal law against defendants convicted in such prior trials." (Omitting footnotes).

Can the failure to apply collateral estoppel substantially impair the truth-finding of a criminal trial? We think not because of the general rule of non-fungibility ·between verdicts.

In a trial on a multi-count indictment, internal consistency in a verdict of guilty on only one count did not implicitly raise the implied acquittals to taint the conviction. Dunn v. United States, 284 U.S. 390, 52 S. Ct. 189, 76 L.Ed. 356.

■ As a general rule consistency of verdicts between those of different juries is not legally required. Anno. 16 A.L.R.3d 866.

As we construe the purpose of *Ashe*, supra, it is to discourage the prosecutorial practice of salami slicing as many possible

charges from one criminal occasion and to discourage the "dry-run" technique of using a second trial to improve the defects of the first.

Neither of these ends appears to us to be a fundamental requisite of a way of seeking the ultimate subjective truth as might be revealed on the Awful Day of Divine Judgment. Rather like Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, the collateral estoppel doctrine discourages to some degree what some writers have called harassment.

On these considerations we conclude that Ashe v. Swenson, supra, is without influence in the instant case.

We see no occasion on this limited remandment to withdraw our original affirmance.

ALMON, J., concurs in result.